UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.   ) | No. 1:12-cr-0061-PB |
| ) | |
| TOSATTI PADMORE ) | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(A) and (C) of the Federal Rules of Criminal Procedure, the United States of America by its attorney, John P. Kacavas, the United States Attorney for the District of New Hampshire, and the defendant, Tosatti Padmore, and the defendant's attorney, Paul Garrity, Esquire, enter into the following Plea Agreement:

1. <u>The Plea and The Offense</u>.

The defendant agrees to plead guilty to Counts One through Five of the Superceding Indictment each of which charge him with Distribution of Oxycodone, in violation of 21 U.S.C. § 841(a)(1) and Count Six which charges of him with Possession of a Firearm in Furtherance of a Drug Trafficking Offense in violation of 18 U.S.C. § 924(c).

In exchange for the defendant's guilty plea, the United States agrees to the sentencing stipulations identified in section 6 of this agreement.

2. <u>The Statute and Elements of the Offense</u>.

Title 21, United States Code, Section 841(a)(1) provides, in pertinent part:

[I]t shall be unlawful for any person knowingly or intentionally ... to ... distribute or dispense, a controlled substance.

21 U.S.C. § 841(a) (West 2012).

The defendant understands that an offense in violation of Section 841(a)(1) has the following elements, each of which the United States would be required to prove beyond a reasonable doubt at trial:

> First, that the defendant, on the dates alleged, transferred to another person the controlled substance, oxycodone;
>
> Second, that the defendant knew that the substance transferred was oxycodone; and
>
> Third, that the defendant acted intentionally, that is, it was the defendant's conscious object to transfer the oxycodone to another.

*Pattern Jury Instructions: First Circuit, Criminal Cases, Instruction 4.23 (1998).*

Title 18, United States Code, Section 924(c) provides, in pertinent part:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person, who, [in furtherance of] any ... drug trafficking crime (including a ... drug trafficking crime that provides for an enhanced punishment if committed by the use of deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, possesses a firearm shall, in addition to the punishment provided for such ... drug trafficking crime ... be sentenced to a term of imprisonment of not less than 5 years.

18 U.S.C. § 924(c) (West 2012).

The defendant understands that the offense has the following elements, each of which the United States would be required to prove beyond a reasonable doubt at trial:

> First, that a drug trafficking crime was committed (in this case distribution of oxycodone); and
>
> Second, the defendant knowingly (i.e., voluntarily and intentionally) possessed a firearm in furtherance of the commission of that crime.

18 U.S.C. § 924(c) (West 2012).

3. <u>Offense Conduct</u>.

The defendant stipulates and agrees that if this case proceeded to trial, the government would prove the following facts and those facts would establish the elements of the offense beyond a reasonable doubt:

On July 19, 2011, a confidential informant disclosed to the Manchester Police Department that he knew an individual who was distributing illegally large quantities of 30 mg oxycodone pills. The informant explained that, over the past two or three months, that individual sold the informant between 25 and 70 30 mg oxycodone pills on a daily basis. The informant knew the individual as "Tosatti." The informant also provided a physical description that matched Tosatti, and the informant's description of "Tosatti's" car matched Tosatti's known car. The informant stated that "Tosatti" lived with his girlfriend, A.F., in a second floor apartment somewhere near the area of the Manchester Gardens apartment complex. Finally, the informant identified a Manchester Police Department photograph of the defendant as a picture of the oxycodone supplier the informant knew as "Tosatti" and a known photograph of A.F. as the defendant's girlfriend.

Later the same day, at the direction of Manchester Police Department detectives, the informant called the defendant and told the defendant that the informant knew someone interested in purchasing oxycodone from the defendant. The informant arranged to meet with the defendant near the intersection of Ashland and Concord Streets in Manchester, to effect the purchase of 20 30 mg oxycodone pills from the defendant. At the appointed time and place, an individual driving a car registered to the defendant's brother, N. P., but positively identified by surveillance officers as the defendant arrived. The informant then got into the car the defendant

was driving and after a short drive (during which the car remained under law enforcement surveillance) returned. The informant then turned over to the police a snack-sized zip-lock bag containing 20 30 mg oxycodone pills. The informant stated that the defendant gave the bag to the informant while they were driving in exchange for $440 in "buy money" that the Manchester Police previously had given the informant.

On July 20, 2011, under the supervision of the Manchester police, the informant called the defendant to arrange for the purchase of another 20 30 mg oxycodone pills from the defendant. A meeting location was established at a gas station at the intersection of Union and Webster Streets in Manchester. At that location, at the appointed time, the defendant again appeared (again driving the car registered to the defendant's brother, N.P.). The informant entered the car, which remained in the parking lot. Upon returning to an undercover police vehicle four or five minutes later, the informant turned over to police (a baggie with ) 19 30 mg oxycodone tablets, which the informant said the defendant gave the informant in exchange for $418 in buy money while they met in the car. The informant stated that the defendant told him that he had only 19 30 mg pills at that time.

Five days later, on July 25, 2011, the informant sent the defendant a text message at the instruction of the police, asking if the defendant could meet the informant to sell the informant 20 30 mg oxycodone pills. The defendant told the informant that the price would be $460 because the defendant had a new, more expensive supplier. A meeting was arranged for a gas station in the Hannaford Plaza in Goffstown, New Hampshire. At the agreed upon place and time, the defendant arrived in a car. The informant exited the Manchester Police undercover vehicle in which he had arrived and got into the car the defendant was driving. The defendant's

car remained at the gas station for about one minute and then drove a short distance from the gas station and parked. The informant then got out of the defendant's car, returned to the undercover car in which he had arrived, and turned over a baggie containing 19 30 mg oxycodone pills to the undercover police officer driving it. The informant explained that he had received the pills from the defendant while in the car the defendant was driving in exchange for $440. Again, the informant reported that the defendant stated he only had 19 pills.

On August 2, 2011, the informant sent another text message to the defendant asking whether the defendant was available to sell the informant 19 30 mg oxycodone pills. The defendant agreed to meet with the informant and complete the transaction at a price of $23 per pill. When the defendant arrived at the agreed upon meeting location, a Rite Aid drug store in Manchester, he was driving a second vehicle registered to his brother, N.P. The informant got out of the undercover car and entered the defendant's car, which remained in the parking lot. After about two minutes, the informant exited the defendant's car, returned to the undercover car and turned over a ripped plastic bag containing 19 30 mg oxycodone pills. The informant stated that he got the bag with the pills from the defendant in exchange for $440 buy money while meeting with the defendant in the defendant's parked car.

Several months later, on January 4, 2012, the informant arranged another purchase of oxycodone from the defendant at the direction of law enforcement, this time 20 15 mg pills for a predetermined price of $230. The agreed upon location was a gas station near the intersection of Maple and Bridge Streets in Manchester. About five minutes after the informant arrived at that location, the informant and surveilling police officers observed that the defendant also had arrived and parked at the fuel pumps. The informant entered the defendant's car as the defendant

fueled it. When he was done pumping, the defendant entered the car and drove a short distance with the informant to the area of Pearl and Russell Streets. Soon, the informant exited the defendant's car and returned to the gas station. Later, the informant turned over a baggie containing 20 15 mg oxycodone pills, which the informant said the defendant gave the informant in exchange for $240 in buy money after driving away from the gas station.

A week later, on January 11, 2012, the informant arranged yet another purchase from the defendant under the supervision of law enforcement. The meeting location was ultimately set for the area of Notre Dame and Amory Streets. Near the agreed upon meet time, the defendant was observed driving in a car registered in his own name from his apartment to the meeting location. The informant entered the defendant's vehicle and after a few minutes returned to the undercover's car, where the informant turned over a plastic baggie containing 10 30 mg oxycodone pills. The informant reported that, while in the defendant's automobile, the defendant gave the informant the baggie and its contents in exchange for $240 in buy money.

On January 18, 2012, law enforcement officers directed the informant to set up a meeting with the defendant for the purpose of buying oxycodone from the defendant. The informant arranged to meet with the defendant at a gas station near Bridge and Maple Streets in Manchester where the defendant would sell the informant 30 15 mg oxycodone pills for $345. After arriving at the meet location, the defendant called the informant and instructed the informant to walk east on Arlington Street. The informant complied and was soon met by the defendant driving a car registered to his brother, N.P. A few minutes later, the informant returned to the undercover vehicle and the informant turned over a plastic bag containing 30 15 mg oxycodone pills which the informant said the defendant gave him after they briefly drove east on Arlington Street in

exchange for $345 in buy money.

Finally, on January 30, 2012, at the instruction of law enforcement, the informant called the defendant and negotiated the purchase from defendant of 20 15 mg oxycodone pills for $230. The meet was planned for the vicinity of the intersection of Front Street and Dunbarton Road in Manchester. At the agreed upon time, however, the informant received a call from the defendant abruptly changing the location of the meeting to a nearby dead end road. After an undercover detective drove the informant to the new location and parked, the defendant arrived in his own car, and parked directly behind them. The informant entered the defendant's vehicle and returned a few minutes later with a plastic bag containing 20 15 mg oxycodone pills. The informant reported that defendant's girlfriend, A.F., was in the car with the defendant and that she gave the informant the plastic bag in exchange for $230 in "buy money." The defendant's car was followed back to his residence where he and A.F. were observed getting out of the car.

The informant wore a body wire in each of the above described transactions and the vast majority of the communications leading up to each transaction were either transmitted by text or in a recorded telephone conversation. All of the transactions were "controlled" in the sense that the informant was searched for money and contraband with no anomalous results both before and after the transactions. In addition to the informant, an undercover officer who accompanied the informant and a number of surveilling police officers can testify to various aspects of the transactions. The nature and quantity of the controlled substances involved in each transaction has been confirmed through laboratory testing and procedures.

Based in part on certain of the transactions described above, a search warrant was obtained for the defendant's residence at 184 Garden Drive, Apartment 15 in Manchester. A

Manchester Police department source had identified that apartment as the defendant's apartment. The source reported that the defendant lived in the apartment with his brother, N.P., but that they "keep it very secret so they can keep dealing and won't get jammed up." The source further stated that only a few select persons are allowed to visit and that the apartment is rented in the name of another person. The source explained that the defendant and N.P. used their parents' address in Goffstown for the purposes of parole and probation checks. As described above, law enforcement also observed the defendant traveling to and from, and the defendant's car parked outside, the apartment at various times. Finally, an individual fitting the defednant's description was also seen inside the apartment partly and fully dressed.

The warrant was executed early in the morning on February 2, 2012. Upon entry, the executing officers discovered the defendant and his girlfriend, A.F., in one of the two bedrooms and the defendant's brother, N.P., and his girlfriend in the other. The search yielded the following from the defendant's bedroom:

- an apparent drug ledger
- a glass smoking pipe with marijuana residue, rolling papers
- a box of ammunition
- $1774 in currency, and a driver's license and credit card in the defendant's name, all from the pocket of the same pair of jeans
- a Micro Desert Eagle .380 semi automatic (Serial number ME04656) manufactured by Magnum Research Corporation reported as stolen from Meredith, N.H., on October 19, 2011; and
- Social Security paperwork issued in the defendant's name;Neville who is

approximately 6'5" tall acknowledged to officers executing the warrant that he wears size 12 shoes. Despite the large sums of cash found in the apartment, both Tosatti and Neville reported during the booking process that they were not employed. Three additional firearms were located on top of the kitchen cabinets – not visible to anyone unless standing on a chair, ladder or step stool.

A large quantity of cash and distribution quantities of oxycodone 30 mg pills and marjuana were found in the other bedroom.

   4. Penalties, Special Assessment and Restitution.

The defendant understands that the penalties for the offense are:

   A.   On each of Counts One through Five, a maximum prison term of twenty (20) years and, on Count Six, a mandatory minimum prison term of five (5) years;

   B.   On each of Counts One through Five, a maximum fine of $1,000,000 and, on Count Six, a maximum fine of $250,000; and

   C.   For each of Counts One through Five, a term of supervised release of at least three (3) years and a maximum of life, and, for Count Six, a maximum term of supervised release of five (5) years. The defendant understands that the defendant's failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring the defendant to serve in prison all or part of the term of supervised release, with no credit for time already spent on supervised release (18 U.S.C. §3583).

The defendant also understands that he will be required to pay a special assessment of $600, $100 for each count of conviction, at or before the time of sentencing; and that the Court may order him to pay restitution to the victim of the offense, pursuant to 18 U.S.C. § 3663 or § 3663A.

5. <u>Sentencing and Application of the Sentencing Guidelines</u>.

The defendant understands that the Sentencing Reform Act of 1984 applies in this case and that the Court is required to consider the United States Sentencing Guidelines as advisory guidelines. The defendant further understands that he has no right to withdraw from this Plea Agreement if the applicable advisory guideline range or his sentence is other than he anticipated.

The defendant also understands that the United States and the United States Probation Office shall:

- A. Advise the Court of any additional, relevant facts that are presently known or may subsequently come to their attention;

- B. Respond to questions from the Court;

- C. Correct any inaccuracies in the pre-sentence report;

- D. Respond to any statements made by him or his counsel to a probation officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant acknowledges that any estimate of the probable sentence or the probable sentencing range under the advisory Sentencing Guidelines that he may have received from any source is only a prediction and not a promise as to the actual sentencing range under the advisory Sentencing Guidelines that the Court will adopt.

6. <u>Sentencing Stipulations and Agreements</u>.

Pursuant to Fed. R. Crim. 11(c)(1)(C), the parties agree as follows:

    a. that the Career Offender provision in Section 4B1.1 of the Sentencing Guidelines do <u>not</u> apply to any of the Counts of the Superceding

        Indictment to which the defendant is pleading guilty; and

    b.      that total sentence on Counts One through Five is no less than thirty six (36) months and no greater than fifty-six (56) months.

The parties intend those stipulations to be "binding" under Fed. R. Crim. P. 11(c)(1)(C). By using the word binding the parties mean that if the Court will not accept the plea agreement under Fed. R. Crim. P. 11(c)(3)(A), the plea agreement is null and void and the defendant will be allowed the opportunity to withdraw his guilty pleas.

Pursuant to Fed. R. Crim. P. 11(c)(1)(A), the government agrees that, upon sentencing, it will dismiss Count Seven of the Superceding Indictment.

The defendant understands and agrees that, except as stated herein, the United States may argue that particular sentencing enhancements should be applied in determining the advisory guideline range in this case, and he is permitted to object to them.

The parties are free to make recommendations with respect to the terms of imprisonment, fines, conditions of probation or supervised release, and any other penalties, requirements, and conditions of sentencing as each party may deem lawful and appropriate, unless such recommendations are inconsistent with the terms of this Plea Agreement.

    7. <u>Acceptance of Responsibility</u>.

The United States agrees that it will not oppose an appropriate reduction in the defendant's adjusted offense level, under the advisory Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the offense. The United States, however, may oppose any adjustment for acceptance of responsibility if the defendant:

A. Fails to admit a complete factual basis for the plea at the time he is sentenced or at any other time;

B. Challenges the United States' offer of proof at any time after the plea is entered;

C. Denies involvement in the offense;

D. Gives conflicting statements about that involvement or is untruthful with the Court, the United States or the Probation Office;

E. Fails to give complete and accurate information about his financial status to the Probation Office;

F. Obstructs or attempts to obstruct justice, prior to sentencing;

G. Has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

H. Fails to appear in court as required;

I. After signing this Plea Agreement, engages in additional criminal conduct; or

J. Attempts to withdraw his guilty plea.

The defendant understands and agrees that he may not withdraw his guilty plea if, for any of the reasons listed above, the United States does not recommend that he receive a reduction in his sentence for acceptance of responsibility.

The defendant also understands and agrees that the Court is not required to reduce the offense level if it finds that he has not accepted responsibility.

If the defendant's offense level is sixteen or greater, and he has assisted the United States in the investigation or prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing

for trial and permitting the United States and the Court to allocate their resources efficiently, the United States will move, at or before sentencing, to decrease the defendant's base offense level by an additional one level pursuant to U.S.S.G. § 3E1.1(b).

8. <u>Waiver of Trial Rights and Consequences of Plea.</u>

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him. The defendant also understands that he has the right:

A. To plead not guilty or to maintain that plea if it has already been made;

B. To be tried by a jury and, at that trial, to the assistance of counsel;

C. To confront and cross-examine witnesses;

D. Not to be compelled to provide testimony that may incriminate him; and

E. To compulsory process for the attendance of witnesses to testify in his defense.

The defendant understands and agrees that by pleading guilty he waives and gives up the foregoing rights and that upon the Court's acceptance of the his guilty plea, he will not be entitled to a trial.

The defendant understands that if he pleads guilty, the Court may ask him questions about the offense, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers will be used against him in a prosecution for perjury or making false statements.

9. <u>Acknowledgment of Guilt; Voluntariness of Plea.</u>

The defendant understands and acknowledges that he:

A. Is entering into this Plea Agreement and is pleading guilty freely and voluntarily because he is guilty;

B. Is entering into this Plea Agreement without reliance upon any promise of benefit of any kind except as set forth in this Plea Agreement;

C. Is entering into this Plea Agreement without threats, force, intimidation, or coercion;

D. Understands the nature of the offense to which he is pleading guilty, including the penalties provided by law; and

E. Is completely satisfied with the representation and advice received from his undersigned attorney.

10. Scope of Agreement.

The defendant acknowledges and understands that this Plea Agreement binds only the undersigned parties and cannot bind any other non-party federal, state or local authority. The defendant also acknowledges that no representations have been made to him about any civil or administrative consequences that may result from the his guilty plea. The defendant understands such matters are solely within the discretion of the specific non-party government agency involved. The defendant further acknowledges that this Plea Agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving the defendant.

11. Collateral Consequences.

The defendant understands that as a consequence of his guilty plea he will be adjudicated guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

12. <u>Satisfaction of Federal Criminal Liability; Breach</u>.

The defendant's guilty plea, if accepted by the Court, will satisfy his federal criminal liability in the District of New Hampshire arising from his participation in the conduct that forms the basis of the Superceding Indictment in this case. The defendant understands that if, before sentencing, he violates any term or condition of this Plea Agreement, engages in any criminal activity, or fails to appear for sentencing, the United States may consider such conduct to be a breach of the Plea Agreement and may withdraw therefrom.

13. <u>Waivers</u>.

A. Appeal.

The defendant understands that he has the right to challenge his guilty plea and/or sentence on direct appeal. By entering into this Plea Agreement the defendant knowingly and voluntarily waives his right to challenge on direct appeal:

1. His guilty plea and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues; and

2. The sentence imposed by the Court if within, or lower than, the guideline range determined by the Court, or if it is imposed pursuant to a minimum mandatory sentence.

The defendant's waiver of his rights does not operate to waive an appeal based upon new legal principles enunciated in Supreme Court or First Circuit case law after the date of this Plea Agreement that have retroactive effect; or on the ground of ineffective assistance of counsel in the negotiation of this Plea Agreement or at the sentencing hearing.

B. Collateral Review

The defendant understands that he may have the right to challenge his guilty plea and/or

-15-

sentence on collateral review, e.g., a motion pursuant to 28 U.S.C. §§ 2241 or 2255.  By entering into this Plea Agreement, the defendant knowingly and voluntarily waives his right to collaterally challenge:

1.  His guilty plea, except as provided below, and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues; and

2.  The sentence imposed by the Court if it falls within, or lower than, the guideline range as determined by the Court, or if it is imposed pursuant to a minimum mandatory sentence.

The defendant's waiver of his right to collateral review does not operate to waive a collateral challenge to his guilty plea on the ground that it was involuntary or unknowing, or on the ground of ineffective assistance of counsel in the negotiation of the Plea Agreement or at the plea or sentencing hearings.  The defendant's waiver of his right to collateral review also does not operate to waive a collateral challenge based on new legal principles enunciated in Supreme Court or First Circuit case law decided after the date of this Plea Agreement that have retroactive effect.

C. Freedom of Information and Privacy Acts

The defendant hereby waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of the case(s) underlying this Plea Agreement, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

D. Appeal by the Government

Noting in this Plea Agreement shall operate to waive the rights or obligations of the Government pursuant to pursue an appeal s authorized by law.

14. No Other Promises.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

15. Final Binding Agreement.

None of the terms of this Plea Agreement shall be binding on the United States until this Plea Agreement is signed by the defendant and the defendant's attorney and until it is signed by the United States Attorney for the District of New Hampshire, or an Assistant United States Attorney.

16. Agreement Provisions Not Severable.

The United States and the defendant understand and agree that if any provision of this Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is null and void and no part of it may be enforced.

JOHN P. KACAVAS
United States Attorney

Date: 2/4/13          By: /s/ William E. Morse

William E. Morse
Assistant U.S. Attorney
Bar Association 421934 (D.C.)
53 Pleasant St., 4th Floor
Concord, NH 03301

The defendant, Tosatti Padmore, certifies that he has read this 18-page Plea Agreement and that he fully understands and accepts its terms.

Date: 2/4/13          /s/ Tosatti Padmore

Tosatti Padmore, Defendant

I have read and explained this 18-page Plea Agreement to the defendant, and he has advised me that he understands and accepts its terms.

Date: 2/4/13          /s/ Paul Garrity

Paul Garrity, Esquire
Attorney for Tosatti Padmore